REEb

01 JAN 30 PH 3: 00

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

F I L E D

1-31-01

Date                          Time

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**WALL STREET FINANCIAL GROUP, INC.,**

      **Plaintiff,**

vs.

**JERRY GUTHRIE, Individually and in Trust
for Patricia A. Lowe, et al.,**

      **Defendants.**

Case No. 8:00-CV-1271-T-26C

_____

**JERRY GUTHRIE, Individually and in Trust
for Patricia A. Lowe, et al.,**

      **Counterclaim-Plaintiffs,**

vs.

**WALL STREET FINANCIAL GROUP, INC.,**

      **Counterclaim-Defendant.**

_____/


**GUTHRIE DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION
AND MOTION TO STAY THIS ACTION AND IN OPPOSITION
TO THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**


Kalju Nekvasil, Esq.
Stephen Krosschell, Esq.
Goodman & Nekvasil, P.A.
14020 Roosevelt Blvd., Suite 808
Clearwater, FL 33762
Tele: (727) 524-8486
Fax:  (727) 524-8786

75

## PRELIMINARY STATEMENT

Plaintiff Wall Street Financial Group, Inc. ("Wall Street"), has moved for a preliminary injunction against the "Guthrie Defendants" -- Jerry Guthrie, Individually and in Trust for Patricia A. Lowe ("Guthrie"), Calvin W. Fuchs, Gwendolyn M. Fuchs (the "Fuchs"), Patrick D. Lake, Diane C. Lake (the "Lakes"), and Romilda P. Gonzalez ("Gonzalez"). These Defendants are part of the same arbitration presently scheduled to begin on February 5, 2001. In response to Wall Street's Motion for Preliminary Injunction, the Guthrie Defendants are moving to compel arbitration and stay this action. The parties have agreed that the arbitrability issues raised in this Memorandum of Law will at the present time be limited to the Guthrie Defendants and that these issues will be raised for the other Defendants at a later date.

## FACTUAL BACKGROUND

### A.    Gilbert Swarts' Transfer of His Suncoast Sales Force to Wall Street

As alleged in the Guthrie Defendants First Amended Statement of Claim (Exh. 27)[1] in the underlying arbitration between the Guthrie Defendants and Wall Street, Wall Street's agents sold the securities at issue in this proceeding to the Guthrie Defendants from Wall Street offices in Altamonte Springs and Clearwater, Florida, that were illegally not registered, in violation of Florida law. (Exh. 27:5) The Clearwater office at 5801 Ulmerton Road had formerly been an illegally unregistered branch office for San Clemente Securities, Inc. ("San Clemente"). The State of Florida determined that San Clemente and its sales representatives, including Gilbert Bradley ("Brad") Swarts ("Swarts"), had illegally sold unsuitable and unregistered promissory notes to defrauded investors from this Clearwater office. (Exh. 5)

---

[1]    References to the Exhibits attached to the Guthrie Defendants' Notice of Filing Verified Documents in Support of their Motion to Compel Arbitration and Motion to Stay this Action and in Opposition to the Plaintiff's Motion for Preliminary Injunction will take the form (Exh. #:#), where the first "#" refers to the number of an Exhibit attached to the Notice of Filing and the second "#," if any, refers to a page number of that Exhibit.

In 1993 and 1994, Swarts had pleaded no contest to possession of crack cocaine, and he was sanctioned by the Florida Department of Insurance for deceptive and misleading sales practices. (Exh. 11, 12) Swarts was the president of Suncoast Financial Services, N.A. ("Suncoast"), a financial services marketing firm that sold unregistered and fraudulent promissory notes and viaticated settlement participations ("viaticals") to unsuspecting investors. Swarts, however, desired to be associated with a registered broker/dealer, to allow him to offer traditional investments such as Certificates of Deposit and mutual funds, in addition to the fraudulent viaticals and promissory notes. Consequently, he associated himself with San Clemente and later joined Westminster Financial Services, Inc. ("Westminster"). (Exh. 14)

Westminster, however, fired him in August 1998, after an internal investigation uncovered the following issues:

> concern over sale of products with no sales agreements; questions as to client suitability; representative and product sponsor failed to provide confirmation and information regarding sales of product in question; informed by State of Florida that the branch office apparently owned by representative was believed to be executing business at a different location with a different broker/dealer and that representative was being investigated for sale of unregistered securities.

(Exh. 13)

After his discharge from Westminster, Swarts looked for another broker/dealer willing to hire his Suncoast sales agents, and he found Wall Street. Swarts moved his Suncoast brokers -- both registered and unregistered personnel -- en masse from Westminster to Wall Street. Despite Swarts' disciplinary and employment history, Wall Street allowed him to open his Clearwater office under the Wall Street name and serve as the de facto supervisor of Wall Street's Clearwater and Altamonte Springs brokers. Although he was not licensed, he conducted business from Wall Street's Clearwater unregistered branch office and controlled the Wall Street brokers and associated persons who marketed the investments at issue to the Guthrie Defendants.

**B.    Wall Street's Knowledge of Swarts' and Myers' Viatical Sales**

After its new Clearwater office opened, Wall Street sent a letter to Robert J. Myers ("Myers"), the nominal "supervisor" of the new Wall Street branch office, which included the following paragraph indicating Wall Street's knowledge of Swarts' desire to sell viaticals.

> Just to reiterate something I mentioned to Brad [Swarts] the other day, don't forget that viatical contracts are a special kind of investment, and that we are held responsible by the NASD for supervising your activity in this product. All viatical sales must therefore be placed through the broker/dealer. Before we can process any of them, we must see the sales kit for whatever viatical companies you intend to use so we can complete our due diligence process.

(Exh. 17)

On January 11, 1999, the State of Florida sent Myers a letter inquiring concerning his Altamonte Springs office's sale of viatical settlements. This letter questioned whether these viatical settlements were sold in compliance with Florida's registration laws, and included the following paragraph:

> It has been brought to the attention of our office that Wall Street Financial Group, Inc. has proposed an investment opportunity, more specifically known as Viatical Financial Settlement, which appears to be the offer for sale of securities falling within the jurisdiction of the Act.

(Exh. 18)

Myers and Swarts called Wall Street to discuss the investigation. (Exh. 21) Myers responded to this letter on January 22, 1999, and forwarded a copy of his response letter to Wall Street. (Exh. 19) Although Wall Street issued a letter of caution to Myers for responding to the Florida Division of Securities without notifying Wall Street (Exh. 20) and was thus aware that both Myers and Swarts were marketing viatical settlements from Wall Street's Clearwater office, Wall Street did not otherwise conduct an investigation into these securities transactions.

**C.    Wall Street's Agents' Use of Wall Street's Name to Conduct Their Transactions.**

Wall Street's licensed agents used Wall Street's and Suncoast's name interchangeably and used Suncoast business cards and correspondence which stated that securities were offered through Wall Street. Wall Street took no steps to clarify the relationship between Wall Street and Suncoast or to establish that the unregistered promissory notes and viaticals marketed by

Suncoast were not placed through Wall Street. Wall Street and Suncoast used the same office, the same employees, the same telephone system, and the same fax machine. By allowing its brokers and associated persons to use Suncoast's name in connection with Wall Street's business, Suncoast became another business name for Wall Street, and Wall Street became responsible for Suncoast's activities.

Erin M. Meehan ("Meehan"), Steven L. Smith ("Smith"), and Myers were all former Westminster brokers who moved with Swarts with the transfer of Suncoast's operations from Westminster to Wall Street. (Exh. 8, 10) Meehan was the Wall Street broker for Defendants Guthrie and the Lakes, Smith was the Wall Street broker for the Fuchs and Gonzalez, and Myers participated in similar sales to other parties in the underlying arbitrations. (Exh. 27:12) Myers was the nominal supervisor for both Meehan and Smith in the Clearwater and Altamonte Springs offices (Exh. 16), but Swarts was the person in control of Myers and the two offices.

Meehan worked from the Clearwater office as well as offices in Altamonte Springs and Orlando, Florida. According to the affidavits of Defendants Guthrie and the Lakes, (Exh. 23, 24) Meehan gave them business cards which identified her as a registered principal with Suncoast and stated that securities were offered through Wall Street. When they called her office, the phone was answered under the names of both Wall Street and Suncoast. Meehan told them that she worked for Suncoast, which was affiliated with Wall Street, and they believed that Suncoast and Wall Street were affiliated companies and that the investment products which Meehan offered them were joint products of both Wall Street and Suncoast. They believed that they were dealing with an agent of Wall Street, that Wall Street was supervising her, and that Wall Street had reviewed and approved these investments for sale to them. (Exh. 23, 24)

The affidavits of Gonzalez and the Fuchs (Exh. 25, 26) establish that Smith likewise told them that Suncoast offered securities through Wall Street. The telephone was answered under the name of both Suncoast and Wall Street. A sign in the office said that securities were

offered through Wall Street. Gonzalez and the Fuchs believed that they were dealing with an agent of Wall Street, that Wall Street was supervising Smith, and that Wall Street had reviewed and approved their investments for sale to them. (Exh. 25, 26)

According to an affidavit signed by Smith (Exh. 22), Smith was a Suncoast employee in Clearwater while he was associated with Wall Street. Wall Street registered the Clearwater office with the NASD as a Wall Street branch office, and employees answered the phone under both Suncoast's and Wall Street's name. A sign in the office, under Suncoast's name, said that securities were offered through Wall Street, and Smith's practice was to tell his clients, including Gonzalez and the Fuchs, that he worked for Suncoast and that Suncoast was affiliated with Wall Street. He believed that Wall Street knew that its brokers in the office, including Meehan, were selling the promissory notes and viatical settlement contracts that he sold to Gonzalez and the Fuchs, and he believed that Wall Street did not object to these sales. He sold these investments to dozens of customers from the Wall Street Clearwater office, and he conducted his business openly. (Exh. 22)

### D. Wall Street's Sales of Fraudulent Investments to The Defendants.

Meehan and Smith were registered representatives for Wall Street at the time they sold the fraudulent investments at issue in this case to the Guthrie Defendants. According to records of the National Association of Securities Dealers, Inc. ("NASD"), Smith was associated with Wall Street from November 24, 1998 to January 5, 2000. (Exh. 10) The affidavits of Gonzalez and the Fuchs reflect that all of their transactions with Smith occurred during this time period. (Exh. 25, 26)

Similarly, Meehan signed her Form U-4 application for securities industry registration with Wall Street on October 5, 1998 (Exh. 7), and she signed her Wall Street representative agreement on October 6, 1998. (Exh. 6) Under NASD rules, the "filing of the U-4 assumes that the individual is employed" by the firm. (Exh. 5:2) Accordingly, Meehan was an employee when she signed the Form U-4. Meehan's employment with Wall Street ended on September

7, 1999. (Exh. 8) The affidavits of Guthrie and the Lakes reflect that their transactions occurred during this time period when Wall Street employed Meehan. (Exh. 23, 24)

Wall Street asserts that Defendant Guthrie purchased one of his investments at a time when Meehan was not associated with the firm. The arbitration Statement of Claim, however, alleges that Guthrie purchased his investment on November 10, 1998 -- the date he received the assignment of benefits for his viatical settlement contract. (Exh. 24:2, 27:12) In addition, Guthrie did not write the check for this investment until October 7, 1998, and the investment issuer did not accept his initial investment until October 12, 1998. (Exh. 24:2) On the other hand, Meehan signed her Form U-4 on October 5, 1998, and signed her representative agreement on October 6, 1998. (Exh. 6, 7) Guthrie thus initially sought to purchase the investment by writing the check after Meehan was associated with the firm, and the investment was not accepted until substantially later. Under black letter contract law, a contract is not complete until acceptance, and this principle applies to securities transactions. See Barnabey v. E.F. Hutton & Co., 715 F. Supp. 1512, 1526 (M.D. Fla. 1989) ("The sale of these securities occurred with the acceptance of the submissions by Viking . . . "); Thiele v. Davidson, 440 F. Supp. 585, 590 (M.D. Fla. 1977) ("Logic dictates the conclusion that a security is not sold until it is delivered . . . ."). Accordingly, Meehan was a Wall Street associated person at the time of this securities sale to Guthrie.

### E. The Arbitration Claims.

In the Guthrie Defendants' arbitration claim against Wall Street, they alleged that Wall Street, through Meehan and Smith, sold fraudulent, unsuitable, and unregistered investments to the Defendants in violation of state and federal law without adequate investigation and through misstatements and omissions of material facts. (Exh. 27) The Guthrie Defendants alleged (i) Wall Street failed to supervise Meehan and Smith in connection with these transactions, and (ii) Wall Street's entire supervisory system was deficient. They also alleged that Wall Street was responsible for its representatives' conduct under the following rule of Florida's Division of Securities and Investor Protection. (Exh. 27:29)

6

Florida Administrative Code Rule 3E-600.002(4): A dealer or investment advisor shall be responsible for the acts, practices, and conduct of his registered associated persons in connection with the purchase and sale of securities until such time as they have been properly terminated . . . .

In filing their Statement of Claim, the Guthrie Defendants relied on three arbitration agreements. The first agreement is in NASD Rule 10301(a), which reads in pertinent part as follows:

Any dispute, claim, or controversy . . . between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code . . . upon the demand of the customer.

(Exh. 1) Wall Street does not dispute that it is an NASD member and is bound to arbitrate customer disputes within the scope of Rule 10301(a). The other arbitration agreements are in the Form U-4 employment applications signed by Meehan and Smith, by which Meehan and Smith agreed to arbitrate all disputes with their customers. (Exh. 7, 9) The NASD told Wall Street it is "required by the rules of the NASD to arbitrate this dispute" as alleged in the arbitration Statement of Claim. (Exh. 28)

## ARGUMENT

I. **THIS COURT SHOULD COMPEL ARBITRATION AND DENY THE MOTION FOR PRELIMINARY INJUNCTION, BECAUSE THE DISPUTES BETWEEN THE PARTIES ARE ARBITRABLE, AND WALL STREET THEREFORE CANNOT ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

A. **This Court Must Resolve All Doubts in Favor of Arbitrability and Must Compel Arbitration Unless it Can Say With Positive Assurance that the Arbitration Obligations are not Susceptible to an Interpretation Which Allows Arbitration.**

This Court should compel arbitration, stay this action pending arbitration, and deny injunctive relief, because the disputes between the parties are arbitrable and Wall Street therefore cannot satisfy the first requirement for injunctive relief -- a substantial likelihood of success on the merits. Wall Street does not dispute that it is an NASD member and that it must arbitrate disputes with customers. A "customer . . . can demand NASD arbitration of its disputes with [a dealer, and the dealer] . . . is compelled by its NASD membership to submit even absent a specific contractual arbitration undertaken taken with [the customer]." Patten

Sec. Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400 (3d Cir. 1987) NASD Rule 10301(a) requires NASD members "to submit to arbitration upon a customer's demand," and it is an "agreement in writing" enforceable under Section 2 of the FAA. 9 U.S.C. § 2. Kidder Peabody & Co. v. Zinsmeyer Trusts Partnership, 41 F.3d 861, 863 (2d Cir. 1994). For the same reasons, the Form U-4 arbitration obligations signed by Meehan, Smith and Wall Street are enforceable. Armijo v. Prudential Ins. Co. of Am., 72 F.3d 793 (10th Cir. 1995).

Wall Street cannot dispute the *existence* of this NASD arbitration obligation but rather its *scope*. Wall Street disagrees that the scope of the NASD arbitration obligation extends to the Guthrie Defendants' claims. Under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), however, the Court employs both a subjective and objective presumption of arbitrability in determining the scope of an arbitration obligation. Subjectively, reviewing courts must resolve all doubts regarding the scope of an arbitration agreement in favor of arbitration.

> Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. . . .
>
> . . . The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability

Moses H. Cone Hosp. v. Mercury Constr. Corp. 460 U.S. 1, 24-25 (1984).

Objectively, the Court requires arbitration unless, with positive assurance, courts can say that the agreement is not susceptible to an interpretation allowing arbitration.

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

AT&T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986) (quotation marks and brackets omitted).

The Third Circuit in Schulte v. The Prudential Ins. Co. of Am., 133 F.3d 225, 231, 234 (3d Cir. 1998), applied this principle to the "insurance business" exception in NASD Rule 10101.

> An inquiry into the scope of an arbitration clause must necessarily begin with the presumption that arbitration applies. . . . [T]his court must operate under a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.
>
> . . . .
>
> . . . Because this court cannot say with certainty what is meant by "intrinsically insurance" claims [under NASD arbitration rules], and whether it embraces employment disputes, our mandate is clear: our presumption in favor of arbitration applies and doubts in construction are resolved against the resisting parties.

The Tenth Circuit has made similar statements about the necessity to arbitrate under NASD rules when their scope is ambiguous.

> Other courts that have sought to interpret these [NASD arbitration] provisions have recognized the ambiguity and unclarity presented although they have resolved the ambiguities in different ways. However, to acknowledge the ambiguity is to resolve the issue, because all ambiguities must be resolved *in favor* of arbitrability.

Armijo, 72 F.3d at 798 (citations omitted).

This presumption is specially appropriate because Rule 10301 broadly calls for arbitration of "*[a]ny* dispute, claim, or controversy." (Exh. 1)

> [A] presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences . . ." In such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

AT&T Technologies, Inc. v. Communication Workers of Am., 475 U.S. 643, 650 (1986) (citation omitted).

**B.      The Disputes Between the Parties Are Arbitrable.**

    **1.      Under NASD Rule 10301, Brokerage Firms are Required to Arbitrate Disputes Not Only With Their Customers but Also With Customers of their Brokers.    Because the Guthrie Defendants Undisputedly Were Customers of Wall Street's Registered Representatives, They are Entitled to Arbitrate Under NASD Rule 10301.**

9

Wall Street incorrectly assumes it is only required to arbitrate under Rule 10301 with its customers and need not otherwise arbitrate with its registered representatives' customers. The Guthrie Defendants were in fact Wall Street's customers for purposes of the NASD arbitration obligation. Nevertheless, this Court need not even reach this point, because the Guthrie Defendants were undisputedly customers of Meehan and Smith, who were associated persons of Wall Street. The Guthrie Defendants therefore were entitled to arbitrate under the plain provisions of Rule 10301(a), which reads as follows:

> Any dispute, claim, or controversy . . . between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code . . . upon the demand of the customer.

(Exh. 1)

As the court recently found in <u>John Hancock Life Ins. Co. v. Wilson</u>, Case No. 00-CV-621 at 2-3 (N.D.N.Y. Dec. 12, 2000):

> [T]he plain terms of NASD Rule 10301 mandate arbitration . . . Here, Defendants were customers of a person associated with Plaintiffs, which are NASD members, and the underlying dispute concerns the business activities of a person associated with Plaintiffs. The Court does not see how [the investors'] knowledge of whether [the broker] was associated with Plaintiffs is relevant to the interpretation of NASD Rule 10301 . . . .

(See attached Exhibit "A")

This decision reiterated the court's earlier statements from the bench on September 11, 2000:

> As used in [Rule 10301], the term "customer" plainly refers to either the member's or the associated person's customer. Here the dispute arises out of the activities of [the stockbroker], who is associated with plaintiffs, which are the NASD member firms. Thus, what is important is that the defendants were customers of a person associated with plaintiffs. Because defendants were [the stockbrokers'] customers and [the stockbroker] was associated with plaintiffs, this dispute is arbitrable.

(See attached Exhibit "B" at 7)

Rule 10301 does not state that an NASD member firm need only arbitrate disputes with "its" customers. To the contrary, the Rule without specification requires a firm to arbitrate disputes with "a" customer and does not distinguish between customers of the firm and

customers of the firm's associated persons. Plainly, "customer" refers at least in some instances to customers of the broker, and nothing in the Rule supports Wall Street's assumption that "customer" no longer refers to the broker's customer when the customer's dispute is with the broker's firm regarding the activities of the broker.

Ambiguities in the Rule, if any, must be resolved in favor of arbitration. If Wall Street were correct, then Rule 10301 would have required arbitration of disputes "between a member and its customers and between associated persons and their customers." The Rule, however, does not contain this language and thus is correctly interpreted to require member firms to arbitrate all disputes with customers, regardless of whether the investor is a customer of the firm or a customer of the associated person.

Investors commonly sue brokerage firms for their brokers' misconduct under theories of vicarious liability such as *respondeat superior*, apparent agency, and controlling person liability. See 15 U.S.C. § 77o (controlling person liability); 15 U.S.C. § 78t (same). It is irrational to suppose that the NASD envisioned a bifurcated procedure in which, for example, "customers" could arbitrate federal securities law claims against individual brokers but must litigate separately in court the vicarious controlling person liability of the brokers' firms for the same claims. Accordingly, Rule 10301 is properly construed to allow the Guthrie Defendants to arbitrate against Wall Street regarding its responsibility for Meehan's and Smith's misconduct, because the Guthrie Defendants were Meehan's and Smith's customers.

> ## 2. Courts and the NASD Liberally Construe Rule 10301 to Cover Disputes that Investors have with Brokerage Firms Regarding their Registered Representatives' Activities.

> ### (i) The NASD Broadly Defines "Customers" to Include Retail Investors Who Are Not Brokers or Dealers.

The Guthrie Defendants demand arbitration with Wall Street not only because they were Meehan's and Smith's customers but also because they were Wall Street's customers for purposes of NASD arbitration rules. Here, as previously explained in this Memorandum, Wall Street allowed Gilbert ("Brad") Swarts, despite his extremely checkered disciplinary and employment history, to transfer a large number of his Suncoast brokers, including Smith,

Meehan, and their supervisor Myers, to Wall Street from their prior brokerage firm where Swarts had been fired. These agents used Wall Street's and Suncoast's name interchangeably and led the Guthrie Defendants to believe that the securities sold to them were approved products of both Wall Street and Suncoast.

Wall Street's brokers used business cards stating that securities were offered through Wall Street, and a sign in the Clearwater office also said that securities were offered through Wall Street. The phone was answered under both Suncoast and Wall Street's name. The Guthrie Defendants thought they were dealing with Wall Street agents, that Wall Street was supervising Smith and Meehan, and that Wall Street had reviewed and approved the investment for sale to them. In addition, Myers, as a Wall Street branch manager and direct supervisor over Meehan and Smith, knew about his employees' sales and in fact sold the same securities himself. Because corporations only act through their employees, Wall Street is properly charged with knowing what its supervisor knew.

Wall Street claims that the Guthrie Defendants were not Wall Street's customers, because Meehan and Smith failed to open an account for the Guthrie Defendants and to recommend investments approved by Wall Street. This cramped interpretation of "customer" is inconsistent with the NASD's broad definition of "customer." According to NASD Rule 0120(g), the NASD's only limit on the term "customer" is that it does not include brokers or dealers. (Exh. 3)

> [The firm's] narrow definition of the term "customer" in Rule 10301(a) finds no support in the judicial decisions applying that rule. A broader interpretation, encompassing persons who had informal business relationships with NASD members, is well-supported in the case law and the NASD Rules. NASD Rule 0120(g)'s definition of "customer" excludes only brokers and dealers.

Wall Street Sec., Inc. v. Ruppert, 80 F. Supp. 2d 786, 789 (S.D. Ohio 1999).

The court in First Montauk Sec. Corp. v. Four Mile Ranch Development Co., 65 F. Supp. 2d 1371, 1381 (S.D. Fla. 1999) (footnotes omitted), agreed that NASD Rule 10301 is not limited to customers with formal accounts.

> NASD Arbitration Rule 10301 and its definitional rule, Rule 0120(g), are broad. Rule 0120(g) simply states that "[t]he term 'customer' shall not include a broker

or dealer." The NASD chose not to limit customers to investors with accounts with the member-firm. Rule 10301 and Rule 0120(g) contain no limitations other than exclusion of brokers and dealers from invoking rules relating to customers.

In Patten Securities v. Diamond Greyhound and Genetics, 819 F. 2d 400, 406 (3d Cir. 1987), the Third Circuit held that interpreting "customer" to include securities issuers was consistent with Rule 0210(g)'s broad definition. See also Grumhaus v. Comerica Sec., Inc., 1999 U.S. Dist. LEXIS 18457, at *9 (N.D. Ill. Nov. 19, 1999) ("Courts have not applied a restrictive construction to the term 'customer.' When the sale of securities is concerned, an informal business relationship will suffice to confer customer status on an investor."); WMA Sec., Inc. v. Wynn, 191 F.R.D. 128, 130-31 (S.D. Ohio 1999) ("'Customer' is not defined as [the firm] would have it, as a person who opened an account with a brokerage firm. . . . [The firm] seeks a hyper-technical definition of the term 'customer.'").

In the context of controversies with dealers and their representatives, the NASD treats "customer" broadly to mean retail consumers or investors, such as the Guthrie Defendants, who have investment-related complaints. Structurally, the NASD arbitration rules use the term "customer" in Rule 10301 as a means to distinguish retail investor disputes from the employment and other intra-industry disputes that are covered under Rule 10201, (Exh. 1) which is an important reason that industry parties are excluded from the definition of customer under Rule 0120(g). Nothing in the SEC's adoption of the NASD's arbitration rules indicates that the SEC or the NASD intended to restrict the NASD arbitration forum merely to those investors with formal accounts -- while cutting off numerous other investors, like the Guthrie Defendants in this case, who have legitimate investment-related disputes against brokerage firms but do not have a formal account. Indeed, when the NASD proposed its arbitration rules to the Securities and Exchange Commission ("SEC"), the NASD's purpose was "to provide investors with a simple and inexpensive procedure for resolution of their controversies with broker-dealers," Notice of Filing a Proposed Rule Change by NASD, Inc., 18 S.E.C. Docket 1372, 1979 WL 16679 at *1 (Dec. 14, 1979), and this purpose is not restricted to investors with formal accounts. The SEC likewise accepted the NASD's broad proposed rule change "to

delete the requirement that disputes be 'securities-related' so that any dispute, claim, or controversy arising out of or in connection with the business of an NASD member is arbitrable." NASD, Inc., 20 S.E.C. Docket 233, 1980 WL 27003 at *1 (May 30, 1980).

When a firm licenses its representatives, the firm must be willing to arbitrate when these representatives use their status to induce consumers to invest. Persons who buy securities from employees because they are the firm's representatives become customers of the firm who are entitled to arbitrate; customers are not merely those persons who open formal accounts. Here, Wall Street owed duties to the Guthrie Defendants to supervise its licensed representative, and it was potentially liable for his conduct. The Guthrie Defendants were therefore directly Wall Street's customers for purposes of NASD arbitration rules.

### (ii) Courts have Repeatedly Found that Persons who Deal with a Firm's Representatives Become Customers for Purposes of the NASD's Arbitration Rules.

The broad common sense reading which courts give to "customer" is illustrated in Wall Street Sec., Inc. v. Ruppert, 80 F. Supp. 2d 786 (S.D. Ohio 1999), in which the court found that the investors were customers because they "dealt with registered representatives of [the firm] while both representatives were associated with [the firm];" accord WMA Sec., Inc. v. Wynn, 191 F.R.D. 128, 131 (S.D. Ohio 1999) ("The [NASD] panel properly found 'customer' status in the absence of an agreement to arbitrate."). Ruppert deemed "irrelevant" the firm's argument that the investors "never had an account" with the firm, that the "promissory notes in which [the investors] invested were not approved products" of the firm, and that the firm was unaware of the fraudulent transactions. Id. "By conducting business with [the firm's] registered representatives, [the investors] conducted business with [the firm] and became its customers for purposes of the NASD arbitration obligation." Id.

Similarly, in Vestax Sec. Corp. v. Skillman, 117 F. Supp. 2d 654, 657 (N.D. Ohio 2000), the court found that the investors' claims were arbitrable under NASD Rule 10301, because they had

> dealt with a registered representative of [the firm]. The evidence further establishes that [the investors] knew that [the broker] was associated with [the

firm] at the time of the alleged misrepresentations that give rise to [the investors'] arbitration claims. The fact that [the investors] never opened accounts with [the firm] is irrelevant. By conducting business with [the firm's] registered representatives, [the investors] conducted business with [the firm] and became its customers.

Accord Vestax Sec. Corp. v. McWood, 116 F. Supp. 2d 865, 869 (E.D. Mich. 2000) ("[C]ourts have construed the term 'customer' within the meaning of NASD Rule 10101 and 10301(a) to include not only those individuals who opened accounts with an NASD member, but those individuals who maintained an informal business relationship with a representative of an NASD member as well."); Investors Capital Corp. v. Brown, 2000 WL 1897770 at *9 (M.D. Fla. Nov. 27, 2000) (The brokers "were subject to [the firm's] general supervision," and the investors were therefore customers "[e]ven if [the brokers] did not represent that [their firm] had a particular involvement with this transaction.").[2]

In Oppenheimer & Co. v. Neidhardt, 56 F.3d 352 (2d Cir. 1995), the stockbroker deposited the investors' funds in an account he controlled and then misappropriated them. After the investors filed an arbitration claim, Oppenheimer argued they were not its customers because the stockbroker never opened their account. The investors were "strangers to Oppenheimer" and that Oppenheimer "never agreed to establish a customer relationship with them." In rejecting these arguments, the court ruled:

> There are two major flaws in Oppenheimer's argument. First, it treats Oppenheimer's Vice President DeSimone as if he were a stranger, rather than one for whose acts Oppenheimer is responsible. In contending that Oppenheimer . . . never dealt with the Claimants, Oppenheimer overlooks the critical fact that when Claimants dealt with DeSimone, they were dealing with Oppenheimer; DeSimone's acts were those of Oppenheimer. Second, Oppenheimer's diversion of the Claimants' funds into an account that did not reflect their status as customers was the very fraud of which they complain. Having turned over their funds to Oppenheimer's representative so as to become customers of Oppenheimer, the Claimants did not lose the legal benefits of customer status because Oppenheimer's representative fraudulently established their account in a manner designed to conceal and defeat their interest.

Id. at 357.

---

[2]     Wall Street points out that Judge Presnell recently vacated his approval of the magistrate's decision in Brown, but Judge Presnell has not yet made a final decision on the matter, and the magistrate's reasoning remains persuasive.

In Lehman Bros. v. Certified Reporting Co., 939 F. Supp. 1334 (N.D. Ill. 1996), the dealer resisted arbitration because the securities were sold through another firm. However, the firm's employees made misrepresentations to the public regarding the security. The court determined that the investors were the firm's customers. "[C]ustomers . . . include not only those who executed purchases with member firms, but also those who maintained a less formal business relationship at the time of the alleged misconduct." Id. at 1340. "[T]he ordinary use of the word 'customer' contemplates, for example, the person who spends time browsing in a department store, but decides not to buy." Id.

In Miller v. Flume, 139 F.3d 1130 (7th Cir. 1998), investors sued a broker-dealer's officers, alleging fraudulent transfers of assets from a predecessor firm to avoid paying an arbitration award. Although the investors had no formal account relationship with the officers and the fraudulent transfers occurred when the investors' dealings with their former firm were over, they nevertheless were the officers' customers under NASD Rule 10301. "The [investors] were customers of [the former firm] at the time the initial fraudulent activities took place, and all of their claims against . . . its associated persons . . . arise out of that direct customer-broker relationship." Id. at 1136.

In another case involving a representative's unauthorized securities sales, the court said:

> Arbitration is looked upon with favor by the courts, and it's a policy of the court to construe liberally arbitration clauses and to resolve any doubts in favor of arbitration.
>
> [C]ustomer under the NASD rules simply means [that it does] not include a broker or dealer, leaving it wide open for interpretation.
>
> This Court finds that [the broker] was [the firm's] agent. . . . [The firm argues] that during this transaction selling unregistered securities he was not their agent, he was acting on their [sic] own, therefore we are not responsible for him, that's an independent agent, has nothing to do with [the firm]. Those funds that [the customers] gave were not placed in an account with [the firm]. Ergo, this does not come under the arbitration requirement that they entered into with the NASD. I find quite to the contrary.
>
> . . . NASD members are bound by its rules. Here I have a customer . . . that dealt with [the stockbroker], who was a representative for [the firm and who] was acting on his own. . . . [H]e goes out and does sell these unsecured securities and all of a sudden the money is gone. If that's [the firm's] agent then

> [the firm] is responsible for him. They are going to have to police him. He's an associate.
>
> I'm looking at [NASD Rule] 10301. It falls dead on as far as I'm concerned. Consequently I will order the parties to compel arbitration. [The firm] will engage in arbitration based on this Court's ruling. And I would grant the motion to compel arbitration.

(See attached Exhibit "C" at 3-4, 6-7)

Wall Street cites <u>Wheat, First Sec. Inc. v. Green</u>, 993 F.2d 814 (11th Cir. 1993), but <u>Wheat, First</u> has little relevance to the case at hand. <u>Wheat, First</u> merely said that "customer status for the purposes of [NASD Rule 10301] must be determined as of the time of the event providing the basis for the allegations of fraud." <u>Id.</u> at 820. Here, however, the Guthrie Defendants do seek to determine customer status as of the time of the events providing the basis for the allegations of fraud. <u>See First Montauk Sec. Corp. v. Four Mile Ranch Development Co</u>, 65 F. Supp. 2d 1371, 1378 (S.D. Fla. 1999) ("[<u>Wheat, First</u>] does not support [the brokerage firm's position]. What [<u>Wheat, First</u>] decided, narrowly, is that the time frame from which to judge customer status was as of the time of the events giving rise [to] the claim. . . ."); <u>Vestax Sec. Corp. v. McWood</u>, 116 F. Supp. 2d 865, 871 (E.D. Mich. 2000) ("The facts of this case, however, are distinguishable from those in <u>Wheat, First Securities</u>. In that case, liability was predicated on the conduct of agents employed by the brokerage firm's predecessor-in-interest where the acquisition agreement expressly disavowed any assumption of liability. By contrast, in this case, the investors dealt with [the firm's] registered representatives at the time the alleged misrepresentations were made.").

The relevant case law therefore compels the conclusion that the disputes between the parties are arbitrable.

> (iii) **The Disputes Between the Parties are Arbitrable under Rule 10301 because they Arose in Connection with the Activities of Wall Street's Associated Persons.**

Wall Street correctly does not claim that the disputes between the parties did not involve its business as required for arbitration under NASD Rule 10301. In the first place, the point is moot, because Rule 10301 applies not only to claims in connection with the firm's

17

business but also to claims "in connection with the activities of persons associated with" the firm. (Exh. 1) Here, because Meehan and Smith were associated with the firm and the disputes concern their activities, these disputes were arbitrable even if they did not relate to the firm's business. "The full clause [in Rule 10301] requires that the claim arise *either* in connection with [the firm's] business *or* in connection with the activities of persons associated with [the firm]." Ruppert, 80 F. Supp. 2d at 789, 790. The court in Vestax Sec. Corp. v. Skillman, 117 F. Supp. 2d 654, 657 (N.D. Ohio 2000), likewise relied on "the second part of NASD Rule 10301(a), which when examined fully requires that the claim arise either in connection with [the firm's] business or in connection with the activities of persons associated with [the firm]."

> **(iv)     The Disputes Between the Parties are Arbitrable under Rule 10301 because they Arose in Connection With Wall Street's Failure to Supervise.**

In any event, the Guthrie Defendants' claims do relate to Wall Street's business, because the Guthrie Defendants assert that Wall Street failed to supervise Meehan and Smith. Courts uniformly hold that disputes regarding a brokerage firm's failure to supervise arise in connection with the firm's business.

> [The investors'] claims . . . arise from [the firm's] failure to supervise its registered representatives. . . . Those claims are, therefore, related . . . to [the firm's] business . . . . They are the proper subject of arbitration pursuant to NASD Rule 10301(a).

Ruppert, 80 F. Supp. 2d at 790.

> [The investors'] claims against [the firm] are based in part on [the firm's] alleged failure to effectively supervise its registered representative . . . . The fact that [the firm] received no compensation for the transactions at issue is insignificant because [the firm's] business includes the supervision of its large corps of registered representatives. Because [the investors'] claims arise in connection with the supervision of one of those representatives, they arise in connection with [the firm's] business.

Skillman, 117 F. Supp. 2d at 657-58 (citations omitted).

In Royal Alliance Assoc. v. Davis, 897 F. Supp. 783, 788 (S.D.N.Y. 1995), the disputes were arbitrable, because the firm was arguably responsible for supervising the broker's "practice of borrowing large amounts of money and failing to repay them," although this

practice appeared "to have nothing whatsoever to do with the [firm's] business, namely, the provision of investment advice and services." In Lehman Bros., 939 F. Supp. at 1338, a dispute related to the firm's business because the firm had a duty to supervise, although the transaction occurred at another firm. In Spear, Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d 21, 29-30 (2d Cir. 1996), insurance companies who issued policies based on a stockbroker's false account statements could arbitrate against the broker's firm, because the firm had a duty to supervise the broker. Accord First Montauk Sec. Corp., 65 F. Supp. 2d at 1380 (Dispute arose in connection with the firm's business, because the firm "admitted . . . it had a duty to supervise its registered representative.").

These court decisions that supervision of brokers' outside business activities is part of a brokerage firm's business follow from long-standing statements of the Securities and Exchange Commission ("SEC") and the NASD. In 1986, the NASD required member firms to supervise their associated persons' private securities transactions, known in the industry as "selling away" from the firm. The NASD told firms to supervise compliance with NASD Rule 3040 (numbered at that time as Article III, Section 40 of the NASD Rules of Fair Practice), which prohibits representatives from selling securities without their firm's knowledge.

> [F]irms employing off-site representatives are responsible for establishing and carrying out procedures that will subject these individuals to effective supervision designed to monitor their securities-related activities and to detect and prevent regulatory and compliance problems. . . .
>
> Because of their location and other circumstances of their employment, off-site personnel have a greater opportunity than on-site personnel to engage in undetected selling away. Consequently, firms that employ such persons are responsible for monitoring their activities in a manner reasonably intended to detect violations.

NASD Notice to Members 86-65, 1986 WL 591919 at *2-3 (Sept. 12, 1986).

The SEC, the NASD, and state enforcement agencies have repeatedly sanctioned firms for failing to supervise selling away activities.

> [The stockbrokers] engaged in numerous private securities transactions without obtaining prior approval from [the firm]. The NASD found that, in connection with those transactions, applicants failed to review and adequately monitor the activities of the San Diego branch office.

We agree with the NASD that applicants were responsible for deficient supervision with respect to the violations at issue. Although no specific information came to their attention that alerted them to the misconduct that occurred, applicants fostered the violative activities . . . by abdicating their supervisory responsibility.

SECO Sec., Inc., 1988 WL 240375 at * 2 (Sept. 1, 1988). See also Signals Sec., Inc., 2000 WL 1423891 at *7 (SEC Sept. 26, 2000) ("[A]llowing a registered representative to engage in outside business activities involves the risk that the representative will use his outside business to carry out or conceal violations of the securities laws. . . . [The firm's] procedures were deficient for failing to . . . require independent verification of such matters as the nature and extent of outside business activities."); PFS Investments, Inc., 1998 WL 422161 at *6 (SEC July 28, 1998) ("[T]he procedures in place at the compliance departments to investigate complaints were not reasonably designed to detect selling away activities. . . . [The firm therefore] failed reasonably to supervise. . . .")

Similarly, Florida sanctioned a brokerage firm for failing "to adequately supervise and reasonably prevent and detect potential [selling away] violations . . . . [The firm] failed to visit the Port Richey, Florida branch office to oversee its operation and failed to review the business records of the Port Richey branch office, which records would have revealed . . . that . . . securities transactions . . . were not being properly recorded in the books and records of [the firm]." National Sec. Corp., 1989 WL 429245 at *4 (Fla. Div. Sec. June 13, 1989). Other state securities enforcement agencies have reached similar conclusions. WMA Sec., Inc., 1998 WL 894863 at *2 (Ariz. Corp. Comm'n Nov. 23, 1998) (The firm's "procedures and the system for employing those procedures was not reasonably designed to prevent and detect [selling away] violations by [its] salesmen."); Advest, Inc., 1998 WL 281064 at *2 (Vt. Sec. Div. Feb. 12, 1998) (The firm's conduct "demonstrates [the firm's] cavalier attitude and indifference to enforcing compliance with Rule 3040. . . . It was this indifference to Rule 3040 which ultimately harmed some of [the firm's] clients."); Philadelphia Investors, Ltd., 1998 WL 644775 at *3 (Pa. Sec. Com. Aug. 13, 1998) (Firm "should have been aware of [its representative's] private securities transactions . . . . [The firm's] supervisory failure had the effect of allowing [the representative]

to conduct such activities . . . ."). Wall Street cannot successfully claim that the duty to supervise private securities transactions is not part of its business, when the SEC, the NASD, and state securities enforcement agencies have sanctioned brokerage firms for violating this duty.

Courts agree that brokerage firms must supervise the unauthorized transactions of their registered representatives. As the court said in <u>Thropp v. Bache Halsey Stuart Shields, Inc.</u>, 650 F.2d 817, 822 (6th Cir. 1981):

> The injury Mrs. Thropp suffered . . . is precisely the sort of harm that proper supervision by [the firm] could and should have prevented. The ostensible purpose of [the firm's] supervisory rules is to prevent fraud and to protect its customers.

Broker-dealers must establish that they "maintained and enforced a reasonable and proper system of supervision and internal control over controlled persons so as to prevent, so far as possible, violations of [the securities laws]." <u>Zweig v. Hearst Corp.</u>, 521 F.2d 1129, 1135 (9th Cir. 1975). Merely pleading ignorance does not satisfy the broker-dealer's burden of proof. That a brokerage firm "neither participated in nor had knowledge of the fraudulent activities of its employees [is] insufficient . . . in the absence of evidence establishing . . . that [the brokerage firm] adequately supervised [the broker's] activities." <u>Paul F. Newton & Co. v. Texas Commerce Bank</u>, 630 F.2d 1111, 1120 (5th Cir. 1980).

In <u>Martin v. Shearson Lehman Hutton, Inc.</u>, 986 F.2d 242 (8th Cir. 1993), a Shearson registered representative persuaded an investor to purchase stock through another brokerage house, after Shearson had instructed its brokers to halt recommendations for that stock.

> We think that [the broker's] solicitation of the business while she was an employee of Shearson is sufficient to make out a prima facie case of controlling person liability. . . . Shearson's agent solicited the purchase of the stock and misrepresented its nature. Shearson had the ability to discipline [the broker's] conduct, and it was this conduct that gave rise to the loss.

<u>Id.</u> at 244.

Thus, court cases and SEC and state enforcement agency decisions compel the conclusion that Wall Street had a duty to supervise Meehan and Smith' actions. This duty was

part of Wall Street's securities business. The disputes between the parties arising in connection with this duty were therefore arbitrable under NASD Rule 10301.

> **(v)** **The Requirement to Supervise Meehan's and Smith's Securities Transactions Was Part of the Core of Wall Street's Business, and Wall Street Could Reasonably Expect to be Required to Arbitrate its Liability for Meehan's and Smith's Sales of Securities.**

Because the Guthrie Defendants alleged that Wall Street had failed to supervise its registered representatives when they sold investments in the name of Wall Street, this Court need not be concerned with Wall Street's argument that, under the Guthrie Defendants' interpretation of Rule 10301, Wall Street "would owe a duty to arbitrate claims asserted by literally the entire world." Wall Street's Memorandum of Law in Support of its Motion for Preliminary Injunction at 6. Meehan and Smith sold investments to the Guthrie Defendants, trading on their status as Wall Street securities representatives. Moreover, Wall Street licensed them as its registered representatives with the applicable federal and state regulatory authorities and thereby announced to the world that they were authorized to sell securities on behalf of Wall Street. Sales of investments and the duty to supervise associated persons rest at the heart of Wall Street's business as a broker-dealer, and controversies regarding Wall Street's failure to perform this duty are presumptively arbitrable under NASD rules. Whether controversies that do not relate to investments or to a broker-dealer's obligations under NASD supervisory rules should be arbitrable is not an issue this Court need resolve.

Courts have considered whether an arbitration obligation under stock exchange rules should be extended to disputes that are not exchange-related. For example, the court in Pearce v. E.F. Hutton Group, Inc., 828 F.2d 826, 832 (D.C. Cir. 1987), saw "no anomaly in compelling an Exchange member accused of wrongdoing to participate in a NYSE arbitration," even if "its actions did not involve Exchange business." The New York Court of Appeals in Nomura Sec. Int'l, Inc. v. Citibank, N.A., 619 N.E. 2d 385, 388 (N.Y. 1993) (citations omitted), agreed.

>[I]t is certainly reasonable for the [NYSE] member to expect that claims by nonmembers calling its business practices into question would be subject to

arbitration under [NYSE rules]. . . . "[T]he Exchange's interest in the business conduct of its members" itself warrants imposition of NYSE's arbitration requirements in such disputes.
. . . .

. . . Petitioner's argument . . . takes too narrow a view of NYSE's regulatory goals. Manifestly, those goals are not limited to combatting dishonest or unscrupulous conduct on the part of those who trade in securities. On the contrary, NYSE and the other self-regulated exchanges have an indisputable interest in "'governing [the] practices and procedures and the business conduct of their members.'"

. . . Thus applying [the NYSE] arbitration mandate to this situation would not exceed either the reasonable expectations of NYSE's members or the proper boundaries of the exchange's self-regulatory authority.

In Spear Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d 21, 30 (2d Cir. 1996), however, the Second Circuit, after considering Pearce and Nomura, concluded that it did not need to determine whether to impose an interpretative gloss that disputes should be required to be "exchange-related" under NYSE rules, because the NYSE required the firm to supervise its stockbroker and the firm could reasonable expect to arbitrate in the NYSE arbitration forum the firm's violations of NYSE rules. Similarly here, the NASD, the SEC, and state securities enforcement agencies require firms to supervise the private securities transactions of their stockbrokers, and this requirement is a part of the core of the firm's business. Accordingly, the Guthrie Defendants' allegations against Wall Street are indeed arbitrable, and this Court need not be concerned with Wall Street's speculative assertions regarding factual circumstances not relating to the firm's business.

> **(vi)** **Not Requiring Arbitration Would Frustrate the Purpose of the NASD Arbitration Rules to Protect the Investing Public.**

Any other conclusion would defeat the purpose and spirit of the broad arbitration obligations imposed by the NASD and other exchanges. According to NASD Rule 0113, NASD rules "shall be interpreted in such manner as will aid in effectuating the purposes and business of the [NASD], and so as to require that all practices in connection with the investment banking and securities business shall be just, reasonable and not unfairly discriminatory." (Exh. 2) In general, as stated in Article XI of the NASD By-Laws, NASD rules are designed to "promote and enforce just and equitable principles of trade and business,

to maintain high standards of commercial honor and integrity among members of the NASD, to prevent fraudulent and manipulative acts and practices, [and] . . . to protect investors and the public interest." (Exh. 4)  The SEC reviews and approves NASD rules to ensure compliance with these requirements.  See Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 233 (1987)  ("No proposed arbitration rule change may take effect unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act.").

In accordance with these principles, the SEC required the NASD to propose arbitration rules, because

> [T]he establishment of an efficient system for resolving disputes . . . should contribute significantly to the procantly to the protection of invehe objective of the federal securities laws), to the increased participation of individual investors in the securities market (which the securities industry has often encouraged), and to the conduct of a securities business in a manner that observes high standards of commercial honor as required, for example, by Article III, Section 1 of the Rules of Fair Practice of the National Association of Securities Dealers [now numbered as Rule 2110] and that promotes just and equitable principles of trade as required by Section 6(b)(5) of the Securities Exchange Act of 1934.

Settling Disputes Between Customers and Registered Brokers and Dealers, 9 S.E.C. Docket 833, 1976 WL 20556 at *1 (June 9, 1976).  Emphasizing these broad purposes underlying the arbitration rules, the SEC deleted any requirement that the NASD arbitration forum be restricted to securities-related disputes.  NASD, Inc., 20 S.E.C. Docket 233, 1980 WL 27003 (May 30, 1980).[3]

Adopting Wall Street's pinched interpretation of "customer" would discriminate against investors without formal accounts, such as the Guthrie Defendants, and would thereby defeat the statutory and regulatory policies underlying the NASD's arbitration rules, which are designed "to protect investors" and not to "permit unfair discrimination."  15 U.S.C. § 78o-3(b)(6).  Consequently, courts have frequently ordered arbitration in circumstances like those

---

[3]     The SEC has frequently held that the NASD's disciplinary authority is not restricted to securities and extends to all types of business-related conduct, even if securities are not involved.  See Leonard John Ialeggio, 63 S.E.C. Docket 295, 1996 WL 632974 at *3 (Oct. 31, 1996) (Broker induced his firm to pay country club fees to which he was not entitled; "[w]e have consistently held that misconduct not related directly to the securities industry nonetheless may violate [NASD Rule 2110].").

in the present case, because arbitration facilitates the statutory and regulatory purposes to promote compliance with the law, increase self-regulation, and provide an inexpensive and fair means for investors to raise disputes against industry parties.

> The NASD is an organization vested with congressionally delegated self-regulatory authority over its members to secure compliance with the federal securities laws and its own regulations in order to attain and preserve the highest standards of legal and ethical behavior in the nation's securities markets. Enforcement of the NASD'S arbitration provisions furthers its goals of securities industry regulation and enforcement.

First Montauk Securities Corp. v. Four Mile Ranch Development Corp., 65 F. Supp. 2d 1371, 1381 (S.D. Fla. 1999).

> Members should reasonably expect to be hauled before an Exchange arbitration when their conduct violates NYSE rules. Our decision today [compelling arbitration] . . . strengthens the presumptive partnership between courts and the national exchanges by allowing and facilitating vigorous self regulation.

Spear, Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d 21, 29-30 (2d Cir. 1996) (emphasis added).

> Interpreting the rule to allow arbitration of exchange-related claims not only comports with members' reasonable expectations, but also facilitates the NYSE's system of self-governance and furthers the strong presumption in favor of arbitration.

Lehman Bros. v. Certified Reporting Co., 939 F. Supp. 1334, 1340 (N.D. Ill. 1996).

Given the breadth of the arbitration provisions, the strong presumption in favor of arbitration, and the purposes of the arbitration rules to protect investors, promote self regulation, and provide a fair forum for resolving investment disputes, this Court should determine that the disputes between the parties are arbitrable.

      3.    **The Guthrie Defendants are Entitled to Arbitrate Pursuant to Meehan's and Smith's Form U-4s, Which Obligate Wall Street to Arbitrate with Meehan's and Smith's Customers.**

          (i)    **The Guthrie Defendants Can Enforce Meehan's and Smith's Form U-4 Arbitration Obligations; by Accepting the Benefits of Meehan's and Smith's Form U-4 Agreements with the NASD, Wall Street was Bound by the Form U-4 Arbitration Obligations.**

The Guthrie Defendants demand arbitration not only under Rule 10301 but also pursuant to the written arbitration agreement in Meehan's and Smith's Form U-4 Applications for Securities Industry Registration, which provide as follows:

5.     I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person . . that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] . . . .

9.     I understand and certify that the representations in this form apply to all employers with whom I seek registration. . . .

(Exh. 7, 9)

After Meehan and Smith signed these Form U-4 contracts with the NASD, Wall Street also signed them and took "appropriate steps to verify the items and attachments contained in" the Form U-4, such as Meehan's and Smith's certification in paragraph 9 that their duty to arbitrate with their customers also applied to their employer, Wall Street. (Exh. 7, 9) Wall Street was a beneficiary of Meehan's and Smith's Form U-4 contracts with the NASD and accepted the benefits of the Form U-4's, which allowed Wall Street to employ Meehan and Smith as Wall Street stockbrokers. Consequently, Wall Street is also bound by the Form U-4s' obligations, because Wall Street knew that these Form U-4s included an agreement to arbitrate disputes with Meehan's and Smith's customers.

The Guthrie Defendants are entitled to enforce these Form U-4 arbitration agreements, signed by Meehan, Smith and Wall Street. The court in <u>Prudential Ins. Co. of Am. v. Shammas</u>, 865 F. Supp. 429 (W.D. Mich. 1993), found that the Form U-4 duty to arbitrate applied to the representative's firm. "The Court agrees . . . that the context of the registration plus the language in [the Form U-4] make it clear that the [broker's] representation concerning arbitration . . . applies to his employer."

[P]laintiff was a third-party beneficiary to Duncan's Agreement with [Merrill Lynch]. Plaintiff actively used the benefits of that CMA Agreement, both the checking account and the VISA card. Therefore, the [arbitration] Agreement between the parties is binding on plaintiff, as beneficiary of the contract.

<u>Wehe v. Montgomery</u>, 711 F. Supp. 1035, 1037 (D. Ore. 1989). <u>See also Lee v. Grandcor Medical Sys.</u>, 702 F. Supp. 252, 255 (D. Colo. 1988) ("A third-party beneficiary must accept

26

a contract's burdens along with its benefits. Moreover, a party may be bound by an arbitration agreement to which it has not expressly agreed."). This Court can compel arbitration for this reason alone.

**(ii)**      **Under the Common Law Doctrines of *Respondeat Superior* and Apparent Agency, Wall Street is Bound by Meehan's and Smith's Arbitration Obligations.**

Wall Street is also responsible for the arbitration obligations of its employees under the doctrines of *respondeat superior* and apparent agency. See Padgett v. School Board of Escambia County, 395 So. 2d 584, 586 (Fla. 1st DCA 1981) (adopting *respondeat superior* doctrine for unauthorized conduct "if it is of the same general nature as, or sufficiently similar to, authorized conduct, taking into consideration the various factors relevant to the master-servant relationship"); Life Ins. Co. of N. Am. v. Del Aguila, 417 So. 2d 651, 652 (Fla. 1982) ("A principal is liable for the tortious conduct of his agent, even though not authorized, if the agent was acting within the scope of his employment or his apparent authority."). Consequently, the arbitration obligations of Wall Street's agents, Meehan and Smith, carried over to Wall Street. Wall Street is incorrectly treating each of its employees "as if he [or she] were a stranger, rather than one for whose acts [the brokerage firm] is responsible . . . . [The firm] overlooks the critical fact that when Claimants dealt with [the representative], they were dealing with [the firm]. [The representative's] acts were those of [the firm]." Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995).

Broker-dealers can act only through their representatives, and representatives and their firms are therefore both subject to each other's arbitration obligations. "Acts by employees of one of the parties to a customer agreement are equally arbitrable as acts of the principals . . ." Scher vs. Bear Stearns & Co., 793 F. Supp. 211, 216 (S.D.N.Y. 1989); Letizia v. Prudential Bache Sec., Inc., 802 F.2d 1185, 188 (9th Cir. 1986) ("In virtually every case, [the courts] have held [that both the brokerage firm] and the brokerage firm employees [are] bound by the arbitration agreement.").

Here, the Guthrie Defendants, as Meehan's and Smith's customers, can arbitrate with them under Rule 10301 and their Form U-4s. Because Meehan and Smith are obligated to arbitrate with the Guthrie Defendants, Wall Street has the same obligation under the *respondeat superior* and apparent authority doctrines, because Meehan and Smith were agents and employees of the firm. Wall Street stands in the shoes of its associated persons as their employer, principal, and controlling person and is subject to the same arbitration obligations that the representatives themselves had.

### 4. The Investments Purchased by the Guthrie Defendants were Securities, and, in any Event, the NASD Arbitration Forum is not Limited to Allegations of Securities Fraud.

Wall Street asserts that the disputes between the parties are not arbitrable, because "the investments allegedly purchased by the Defendants . . . were not securities . . . . The viatical settlements are insurance products, and the alleged corporate notes purchased by the Defendants apparently did not exist." Wall Street's Verified Motion for Preliminary Injunction at 5. Whether the corporate notes sold to the Defendants actually existed, however, is irrelevant to whether they are securities, because the Guthrie Defendants did in fact receive documents purporting to be investment contracts.

> It is clear by now that the anti-fraud provisions relied upon by the Commission are applicable even where, as here, the "security" at issue does not exist. See Securities & Exchange Comm'n v. Lauer, 52 F.3d 667, 670 (7th Cir. 1995) ([("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws. Lauer overlooks the fact that it is the representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract (or other security).]; Mishkin v. Peat, Marwick, Mitchell & Co., 744 F. Supp. 531, 553 n. 10 (S.D.N.Y. 1990) ("[t]he fact that the securities did not exist does not remove this action from the operation of the Federal Securities Laws.").

SEC v. Gallard, 1997 WL 767570 at *3 (S.D.N.Y. Dec. 10, 1997).

Furthermore, Wall Street conveniently neglects to mention that both the SEC (see attached Exhibit "D") and the Florida Division of Securities have found that the viaticals sold to the Defendants were indeed securities. American Benefits Services, Inc., 1999 WL 691611 (Fla. Div. Sec. Aug. 17, 1999). As the SEC's and the Florida Division of Securities' enforcement actions against the viatical issuers show, the funds invested were usually not used

for particular insurance policies and instead were simply misappropriated to purchase luxury cars, jets, helicopters, pleasure boats, mansions, and lavish gifts. The viatical issuers guaranteed a return for three years or the investors could rescind their investment with a full refund of principal, plus interest. These factors substantially establish that these viaticals were securities, because the viaticals, by offering guarantees or rescission with interest, necessarily required non-ministerial services from the issuers after the purchase to support the rescission offers and guarantees.

In addition, Section 517.301(1)(a) of the Florida Securities and Investor Protection Act prohibits fraud "[i]n connection with the rendering of *any investment advice* or in connection with the offer, sale, or purchase of any *investment* or security." The words "investment or" and "rendering of any investment advice or in connection with the" was added by the Florida legislature in 1984 and 1992. Laws of Florida ch. 84-159, § 13, and ch. 92-45, § 8. The text, as amended, is unambiguous that Section 517.301 applies to all investments, not only to securities. Consequently, the Florida Securities and Investor Protection Act applies to these viaticals, even assuming *arguendo* that they are not securities (which they are).

Finally, and contrary to Wall Street's assertions, nothing in NASD Rule 10301 or the rest of the NASD Code of Arbitration Procedure supports Wall Street's assumption that the NASD arbitration forum is restricted to securities claims and does not reach other types of investment practices. The matters eligible for submission to arbitration under NASD Rule 10101 (Exh. 1) are not limited to securities-related disputes and instead extend to all disputes arising out of or in connection with the business of an NASD member. NASD Rule 10101 was amended in 1980 "to delete the requirement that disputes be 'securities-related' so that any dispute, claim or controversy arising out of or in connection with the business of an NASD member is arbitrable." NASD, Inc., 20 S.E.C. Docket 233, 1980 WL 27003 at *1 (May 30, 1980). Consequently, disputes relating to the Guthrie Defendants' investments are arbitrable under the NASD Code, even if the investments they purchased were not securities, because the NASD Code is not limited to securities-related disputes.

For all of these reasons, this Court must compel arbitration, stay this action, and deny Wall Street's Motion for Preliminary Injunction, because Wall Street has not established a substantial likelihood of success on the merits.

## II.     IF THIS COURT COMPELS ARBITRATION, A STAY IS MANDATORY

Pursuant to Section 3 of the FAA, 9 U.S.C. § 3, the "court in which . . . suit is pending, upon being set aside that the issue involved in such suit or proceeding is referable to arbitration . . ., shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . ." Here, the Guthrie Defendants have brought a counterclaim in this Court upon issues that this Court, if it compels arbitration, will have decided are referable to arbitration. The mandatory language of Section 3 will then require this Court to stay this action, pending arbitration.

In accordance with Section 3, appellate courts, including the Eleventh Circuit, have frequently determined that the trial court "erred in dismissing the claims rather than staying them. Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration." Bender v. A.G. Edwards & Sons, 971 F.2d 698, 699 (11th Cir. 1992); accord Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953, 955 (10th Cir. 1994) (error to dismiss rather than stay action pending arbitration). Consequently, this Court should stay this action pending arbitration.

WHEREFORE, the Guthrie Defendants respectfully request this Court to compel arbitration, stay this action pending arbitration, and deny Wall Street's request for preliminary injunctive relief.

## CERTIFICATE OF SERVICE

I certify that a copy hereof has been furnished via facsimile and U.S. Mail to **Francis M. Curran, Esq.**, Holland & Knight, LLP, 400 North Ashley Drive, Suite 2300, P.O. Box 1288, Tampa, FL 33601-1288, on this 30th day of January, 2001.

GOODMAN & NEKVASIL, P.A.

Stephen Krosschell, Esq.
Florida Bar No. 0351199
Kalju Nekvasil, Esq.
Florida Bar No. 0866946
14020 Roosevelt Blvd., Suite 808
P.O. Box 17709
Clearwater, FL 33762
Phone:     (727) 524-8486
Facsimile: (727) 524-8786
Attorneys for Defendants and Counterclaim-Plaintiffs

F:\WPDATA\User02\Guthrie,J\District\Mem.Law.Support.Compel

# DOCUMENT, ATTACHMENTS, OR EXHIBITS NOT SCANNED

## FOR THE FOLLOWING REASON(S):

☑ PHYSICAL SIZE OF ____ (LARGER OR SMALLER THAN 8 ½ X 11)

___ EXCEEDS PAGE LIM____

___ DOUBLE-SIDED PA____

___ BINDING CANNOT ____ MOVED WITHOUT DAMAGING DOCUM____

___ CASE LAW

___ SOCIAL SECURITY ____ RD/ANSWER

___ TRANSCRIPT

# PLEASE REF____ TO COURT FILE FOR ____ MPLETE DOC____ENT